UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

In re:                              )
                                    )
SYLVESTER CRAWLEY                   )      Case No. 08-14419-SSM
KATHRYN ROGERS CRAWLEY              )      Chapter 7
                                    )
        Debtors                     )

**MEMORANDUM OPINION**

Before the court is the motion of W. Clarkson McDow, Jr., United States Trustee, Region

Four ("U.S. Trustee") to dismiss the debtors' case as an abuse of chapter 7.  An evidentiary

hearing was held on January 29, 2009, at which the debtors were present in person and were

represented by their attorney of record.  For the reasons stated, the court concludes, based on the

totality of the circumstances—including, primarily, the debtors' ability to repay a meaningful

portion of their debts in a chapter 11 plan—that this case should be dismissed unless the debtors

convert their case to chapter 11.

<u>Background</u>

Sylvester Crawley and Kathryn Rogers Crawley ("the debtors") are husband and wife.

Together they earn approximately $114,504 a year from employment and receive approximately

$12,600 a year in pension income.  They filed a joint voluntary petition in this court on July 25,

2008, for relief under chapter 7 of the Bankruptcy Code, listing $1,272,914 in secured debt and

$40,457 in unsecured debt.[1]  With the exception of a relatively modest automobile loan, their

---

[1]  The debtors had previously filed a chapter 7 case in this court on July 17, 1998, and received a
(continued...)

1

secured debt consisted of four mortgages against two parcels of real estate, one of which had

been the debtors' residence until shortly before the filing, when they moved into a rental

apartment.  According to the schedules, each of the properties was under water by approximately

$150,000.  The monthly payments on the four mortgages total $9,172.  The debtors have not

made mortgage payments since May 2008, and their stated intention is to surrender both parcels

of real estate.[2]

    With their schedules, the debtors filed the required Chapter 7 Statement of Current

Monthly Income and Means-Test Calculation (Official Form 22A or "means test form")

reporting current monthly income ("CMI") of $10,592, annualized CMI of $127,106, a

household size of 2, and deductions of $13,328, for a monthly disposable income of *negative*

$2,736.  The means-test deductions taken by the debtors include $9,173 per month as the

payments contractually due on the four mortgages against the real estate the debtors propose to

surrender as well as a $489 ownership expense allowance with respect to an automobile that the

debtors own free and clear.

    Following the meeting of creditors, the U.S. Trustee filed a timely statement that the

debtor's case should be presumed an abuse under § 707(b) of the Bankruptcy Code, and on

---

[1](...continued)
discharge on October 30, 1998.  *In re Sylvester Crawley and Kathryn R. Crawley*, No. 98-15349-
MVB.  The U.S. Trustee does not contend that the prior filing has any bearing on whether the
present case is an abuse of chapter 7.  Certainly, it has no bearing on the debtors' eligibility for a
discharge, since the prior case was filed some ten years before the present case, and the statutory
bar on successive chapter 7 discharges is currently 8 years.  § 727(a)(8), Bankruptcy Code.

[2]  Relief from the automatic stay has already been granted with respect to one of the properties
and a motion for relief from the automatic stay is pending with respect to the other.  The trustee
has filed a report of no distribution.

October 8, 2008, filed the motion that is presently before the court.  At the hearing, the U.S.

Trustee presented evidence and analysis showing that at the time the debtors filed this case, their

monthly income, net of withholdings and wage deductions, was $7,017 and their actual monthly

expenses were $4,755, leaving them with a monthly surplus of $2,261.[3]  With respect to the

means-test analysis, the U.S. Trustee agreed with the debtors' calculation of CMI but asserted

that a number of adjustments should be made to the claimed deductions.  Although several of

these were actually in the debtors' favor,[4] the U.S. Trustee backed out the deductions for the

mortgage payments as well as the automobile ownership expense for the vehicle that was owned

free and clear.[5]  The result, according to the U.S. Trustee, is that the debtors were entitled to

deductions of no more than $9,477, leaving disposable income of $1,115 a month, or $66,892

over a 60-month period.

Mr. and Mrs. Crawley are each 56 years old.  Mr. Crawley is a high school graduate with

one year of college.  Mrs. Crawley is a high school graduate.  They began their careers working

as assemblers for IBM, where they both worked for 19 years.  They now work for separate

technology companies, he as a desktop support technician, she as a receptionist manager.  Their

---

[3] As will be discussed, the court finds that the actual monthly surplus is $1,847.

[4] Most notably, the U.S. Trustee correctly determined that the debtors' federal and state income tax withholdings substantially understated their actual tax liability.  Presumably, the debtors had claimed extra withholding exemptions based on the anticipated interest and real estate tax deductions related to the two parcels of real estate.  With those parcels being surrendered, the debtors would of course no longer have those tax deductions.

[5] A table reflecting the debtors' calculations, the U.S. Trustee's proposed adjustments, and the court's reconciliation is attached as an exhibit to this opinion.

combined gross monthly wages are $9,542, and their combined take-home pay is $7,160.  In

addition, they receive small monthly pensions from IBM totaling $1,050.

At the time they filed their petition, they owned two homes, a house located at 5977

Maxfield Court, Manassas, Virginia, and a townhouse located at 16371 Gangplank Court,

Woodbridge, Virginia.  The Maxfield Court property was purchased in June 2005 for $712,856

and had been the debtors' home until shortly before they filed their bankruptcy petition.  They

purchased the Gangplank Court property in April 2007 for $489,531 with the intent of moving

into it, apparently in an effort to "down-size" and reduce expenses.  Mr. Crawley testified that

immediately prior to the settlement on the Gangplank Court property, however, the promised

financing disappeared, and he was forced to accept a mortgage with a much higher interest rate or

lose his deposit.  The debtors rented out the townhouse while they attempted to sell the Maxfield

Court property, but the rent was not sufficient to cover the mortgage payments, and they were

never able to sell the Maxfield Court property.  When they consulted with an experienced

bankruptcy attorney, he advised them to move out of the Maxfield Court property and into a

rental apartment, which they did.

<u>Discussion</u>

I.

A chapter 7 case of an individual with primarily consumer debts may be dismissed—or,

with the debtor's consent, converted to chapter 13—if the court determines that the granting of

relief would be an abuse of chapter 7.  § 707(b)(1), Bankruptcy Code.  The current statutory

scheme was enacted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of

2005, Pub. L. 109-8, 119 Stat. 23 ("BAPCPA").  Prior to BAPCPA, a chapter 7 case of an

4

individual whose debts were primarily consumer debts could be dismissed—on the court's own motion or on motion of the United States Trustee, but not at the suggestion or request of creditors—if chapter 7 relief would constitute a "substantial abuse." *Green v. Staples (In re Green)*, 934 F.2d 568 (4th Cir. 1991) (adopting totality of the circumstances test for substantial abuse). BAPCPA made a number of significant changes. First, the standard was modified from "substantial abuse" to "abuse." § 707(b)(1), Bankruptcy Code. Second, standing to bring such motions was now given to trustees and creditors in some instances. *Id.* And third, an elaborate, if somewhat artificial, "means test" was created that triggers a presumption of abuse if the debtor's "current monthly income"—defined as the debtor's average monthly income for the 6-month period *preceding* the filing of the bankruptcy petition—less certain specified allowances and expenses (some based on IRS collection standards and some based on actual expenditures), multiplied by 60, exceeds $6,575 (provided that would pay at least 25% of nonpriority unsecured claims), or $10,950, regardless of the amount of the claims. § 707(b)(2), Bankruptcy Code. The means test only applies, however, to debtors whose CMI exceeds the state-wide median income for a household of the same size. § 707(b)(7), Bankruptcy Code. But even if the presumption of abuse does not arise or is rebutted, the case can nevertheless be dismissed if the petition was filed in bad faith or "the totality of the circumstances . . . demonstrates abuse." § 707(b)(3), Bankruptcy Code.

## II.

With respect to the means test, the dispute between the debtors and the U.S. Trustee centers on two deductions from CMI referenced in the statute. The first is the vehicle ownership expense specified by the "National Standards and Local Standards . . . issued by the Internal

Revenue Service for the area in which the debtor resides, as in effect on the date of the order for

relief."  § 707(b)(2)(A)(ii)(1), Bankruptcy Code.  The second, and by far more significant, is "the

debtor's average monthly payments on account of secured debts . . . calculated as the sum of . . .

the total of all amounts *scheduled as contractually due to secured creditors* in each month of the

60 months following the date of the petition."  § 707(b)(2)(A)(iii), Bankruptcy Code (emphasis

added).

## A.

Addressing first the vehicle ownership expense, there is no dispute that at the time the

debtors filed their petition, the IRS National Standards for transportation expenses included an

ownership expense allowance of $498 per vehicle for a maximum of two vehicles.  The debtors

own three motor vehicles: a 1998 Mercury Marquis, a 2004 Volkswagen Passat, and a 1982

Mercedes 380SL.[6]  The Marquis and the Mercedes are each owned free and clear.  The Passat is

subject to a lien in favor of Capital One Auto Financing.  On their means test form, the debtors

claimed the full $489 ownership expense allowance for the Mercury Marquis.  They claimed the

same allowance for the Passat, but—as required by the means test form—subtracted out the $399

monthly payment to Capital One, for a net ownership expense allowance of $90.

Although some courts have held that an ownership expense allowance may not be taken

on a vehicle that the debtor owns free and clear, the majority and better-reasoned view, the court

believes, is that such a deduction is authorized by the plain language of the statute.  *In re Ross-*

*Tousey*, 549 F.3d 1148 (7th Cir. 2008); *In re Lynch*, 368 B.R. 487 (Bankr. E.D. Va. 2007); *In re*

---

[6]  Mr. Crawley testified at the hearing that the engine of the Mercedes did not work.  The debtors
did, however, value the vehicle at $4,000 on their schedules.  In any event, no means-test
deduction was taken with respect to the Mercedes.

*Watson*, 366 B.R. 523 (Bankr. D. Md. 2007).[7]  Accordingly, the court determines that the

$489.00 ownership expense allowance was properly deducted from CMI for purposes of the

means test.

B.

With respect to the $9,477 in monthly payments on the four mortgages against the two

residential properties that the debtors propose to surrender, the court likewise

concludes—although again there is case authority to the contrary—that their deduction (as

"payments *scheduled as contractually due*" during the 60 months following the filing of the

petition) is permitted by the plain language of the statute.  *Lynch v. Haenke (In re Haenke)*, 395

B.R. 346 (E.D. N.C. 2008) (holding that for purpose of the means test, debtor can deduct

mortgage payment even though debtor will abandon property); *In re Quigley*, 391 B.R. 294

(Bankr. N.D. W. Va. 2008) (holding that above-median income chapter 13 debtor entitled to

deduct payments for 2 ATVs even though she intended to surrender them).[8]  While there are no

---

[7]  In addition to the cases cited, the following decisions by courts within the Fourth Circuit have
allowed debtors to take the IRS allowance for vehicle ownership expense in calculating
disposable income under the means test even though the vehicle was owned outright:  *In re
Daniels-Brown*, 2008 WL 4379152 (Bankr. D. Md. 2008) (chapter 7 case); *In re Simms*, 2008
WL 217174 (Bankr. N.D. W. Va. 2008) (chapter 13 case); *In re Enright*, 397 B.R. 272 (Bankr.
M.D. N.C. 2007); *In re Hice*, 376 B.R. 771 (Bankr. D. S.C. 2007) (chapter 7 case); *In re Hylton*,
374 B.R. 579 (Bankr. W.D. Va. 2007) (chapter 13); *In re Buck*, 2007 WL 4418145 (Bankr. E.D.
Va. 2007) (chapter 13); *In re Megginson*, 2007 WL 2609783 (Bankr. D. Md. 2007) (chapter 7);
*In re Crews*, 2006 WL 3782865 (Bankr. M.D. N.C. 2006) (chapter 13); *In re Prince*, 2006 WL
3501281 (Bankr. M.D. N.C. 2006) (chapter 7).

[8]  No court of appeals appears to have yet ruled on the issue, and the only reported decisions to
the contrary within the Fourth Circuit are *In re Edmunds*, 350 B.R. 636, 644 (Bankr. D. S.C.
2006) (above-median income chapter 13 debtors not allowed to deduct payments on vehicle they
intended to surrender); *In re Ray*, 362 B.R. 680 (Bankr. D. S.C. 2007) (chapter 7 debtors could
not deduct payments on motorcycle and RV they intended to surrender); and *In re McPherson*,

(continued...)

7

reported decisions within this district, a number of unreported decisions have reached the same

conclusion. *In re Hoskings*, 2008 WL 2235350 (Bankr. E.D. Va. 2008); *In re Degrosseilliers*,

2008 WL 2725808 (Bankr. E.D. Va. 2008); *In re Demesones*, 2008 WL 4735593 (Bankr. E.D.

Va. 2008).

The U.S. Trustee does not dispute that, on the filing date of the bankruptcy petition, the

monthly payments *contractually due* on the four mortgages over the next 60 months averaged

$9,477 per month.  The U.S. Trustee's position, in a nutshell, is that the court should take a

forward-looking view at what the situation will be, say, three or six months down the road in

light of the stated intent to surrender the property.  Once the properties have gone to foreclosure,

any remaining liability would of course be unsecured, with the result that any payment obligation

that survived foreclosure would no longer constitute payment on a secured debt.  The U.S.

Trustee's argument supposes that the means test was intended as something other than what it

is—a purely formulaic determination of ability to repay debts in a hypothetical chapter 13 plan.

Part of the formula consists of on-going payments on secured debt.  The formula takes no

account of whether it would be wise or fair for the debtors to keep the collateral at the expense of

unsecured creditors, nor whether, in an actual chapter 13 case, the debtor would be required to

make those payments or could, for example, strip down the principal of the loan to the value of

the collateral and reduce the interest rate.  What the means test calculates, in short, is not what

unsecured creditors will *actually* receive in chapter 13, but rather the least amount they would

---

[8](...continued)
350 B.R. 38 (Bankr. W.D. Va. 2006) (holding that projected disposable income for an
above-median income debtor would not include a deduction for contractual payments on under-
secured debt that the debtor would not actually be required to pay because the plan bifurcated the
claim or surrendered the collateral).

likely receive, based on a snapshot of the debtor's income and expenses as of the filing date of

the petition.  That a snapshot rather than a predict-the-future analysis is appropriate is amply

demonstrated by the fact that the starting point for the calculation, CMI, is itself firmly-rooted in

the past, not the future.  CMI is calculated as the average of the income received by the debtor in

the six months *preceding* the bankruptcy petition.  § 101(10A), Bankruptcy Code.  Why apples

should be deducted from oranges—which is what the U.S Trustee is really urging in asking the

court to determine deductions based on events taking place *after* the bankruptcy filing—is a

mystery.[9]  Accordingly, the court determines that the debtors, in performing their means test

calculations, are entitled to deduct the average of the payments that would be contractually due,

as of the filing date of the petition, for the subsequent 60 months on the four mortgages,

notwithstanding their stated intent to surrender both houses.

## C.

The other adjustments made by the U.S. Trustee (all of them in the debtors' favor) are

appropriate, and the court will adopt them.[10]  The debtors' CMI (as both the debtors and the U.S.

Trustee agree) is $10,592.  The deductions to which the debtors are entitled under the means test

total $17,724 per month, which equates to a disposable income of *negative* $7,132 per month.

Even multiplied by 60, a negative number is necessarily less than the $6,575 needed to give rise

---

[9]  Since this is a chapter 7 case, not a chapter 13 case, the court need not determine whether the
chapter 13 projected disposable income test—which for above-median income debtors
incorporates, with slight variations, the chapter 7 means test—implies (by use of the qualifying
term "projected") a forward-looking analysis.

[10]  The court has not included a deduction for the administrative expense of a chapter 13 case, as
such a calculation would require the court to make a number of arbitrary assumptions about the
shape of the actual plan.

to a presumption of abuse.  Accordingly, the U.S. Trustee's motion to dismiss, to the extent it

relies on a presumption of abuse, must be denied.

III.

The fact that the debtors "pass" the means test does not, however, end the inquiry.  Even

in the absence of the statutory presumption, the case may nevertheless be dismissed as an abuse

if "the totality of the circumstances (including whether the debtor seeks to reject a personal

services contract and the financial need for such rejection as sought by the debtor) demonstrates

abuse."  § 707(b)(3), Bankruptcy Code.  The Fourth Circuit, in a pre-BAPCPA decision, had

already adopted a totality-of-the-circumstances test for the then "substantial abuse" standard for

dismissal and had identified a number of factors the court should consider.  *Green v. Staples (In

re Green)*, 934 F.2d 568 (4th Cir. 1991).  These include whether the petition was filed because of

sudden illness, calamity, disability, or unemployment; whether the debtor incurred cash advances

and made consumer purchases far in excess of ability to repay; whether the debtor's proposed

family budget is excessive or unreasonable; whether the debtor's schedules and statement of

current income and expenses reasonably and accurately reflect true financial condition; whether

the petition was filed in good faith; and the relation of the debtor's future income to his future

necessary expenses.  *Id.* at 572-573.  Although the standard for dismissal has now been modified

from "substantial abuse" to "abuse," the court believes that the factors identified in *Green* remain

relevant considerations, although it may well be that a debtor's ability to pay a meaningful

portion of his or her debts in a  chapter 13 plan would be a more significant factor now than

under the former standard of substantial abuse.

A.

The debtors' attorney, however, raises an interesting threshold argument.  Specifically, he

argues that his clients would not in fact be eligible for chapter 13 relief and suggests that

dismissal under § 707(b) would not be proper unless the debtors were actually eligible to file

under chapter 13 instead of chapter 7.  To proceed under chapter 13, a debtor must have non-

contingent, liquidated, unsecured debts of less than $336,900, and non-contingent, liquidated

secured debts of less than $1,010,650.  § 109(e), Bankruptcy Code.  The debtors' schedules, as

noted, report $1,272,914 in secured debt and $40,457 in unsecured debt.  At first blush this

would appear to put them over the secured debt limit for chapter 13.  The schedules also reflect,

however, that $305,114 of the nominally-secured debt is actually unsecured because the

collateral is worth less than the claims it secures.  § 506(a), Bankruptcy Code.  For purposes of

the § 109(e) analysis, the under-secured portion must be subtracted from the secured debt and

added to the unsecured debt.  *Singer Asset Finance Co., LLC v. Mullins (In re Mullins)*, 360 B.R.

489 (Bankr. W.D. Va. 2007); *Brown and Co. v. Balbus (In re Balbus)*, 933 F.2d 246 (4th Cir.

1991).  Although the resulting adjustment brings the debtors below the *secured* debt limit, it

causes them to exceed the *unsecured* debt limit.:

| | | |
|---|---|---|
| Scheduled secured debt | $ | 1,212,914 |
| Less under-secured portion | $ | 305,114 |
| Net secured debt | $ | 907,800 |
| | | |
| Scheduled unsecured debt | $ | 40,457 |
| Plus under-secured portion | $ | 305,114 |
| Total unsecured debt | $ | 345,571 |

11

The court therefore agrees with the debtors that they would *not* have been eligible to file under chapter 13.[11]  Whether that fact should insulate their case from dismissal for abuse based on ability to pay is much more problematical.  Certainly, much of the public debate leading up to the enactment of BAPCPA stressed a desire to steer debtors who could repay their debts into chapter 13 repayment plans as an alternative to chapter 7.  And the statute itself, which gives the court discretion (if the debtor consents) to convert a case to chapter 13 instead of dismissing it, suggests strongly that Congress saw chapter 13 as the alternative to chapter 7.  Thus if chapter 13 is not actually available, an argument could certainly be made that the debtors should be allowed to proceed under chapter 7.  Of course, mere ineligibility for chapter 13 relief does not close the door to repayment of debts under bankruptcy court protection and supervision.  After all, chapter 11 allows formulation and confirmation of a repayment plan and is just as available to individual debtors as it is to corporations.  *Toibb v. Radloff*, 501 U.S. 157, 111 S.Ct. 2197 (1991).  But, as debtors' counsel correctly notes, chapter 11—because it was really designed for business reorganizations—is many times more expensive than chapter 13.  The filing fee alone is roughly three times the filing fee for a chapter 13 case.  28 U.S.C. § 1930(a)(1)(A) and (3).  In addition, the debtors would be required to pay quarterly fees to the U.S. Trustee until their plan was complete.  28 U.S.C. § 1930(a)(6).[12]  Finally, because of the substantial additional tasks required

---

[11]  The court declines the U.S. Trustee's suggestion—unsupported by any authority—that the unsecured portion of the real estate debt should simply be ignored on the ground that mortgage companies only rarely file deficiency claims in chapter 13.  An individual whose debts exceed the chapter 13 limits does not become eligible for chapter 13 relief simply because particular creditors neglect to file proofs of claim.

[12]  The amount of the fee is set on a sliding scale based on the debtor's "disbursements" during the quarter, with the minimum fee being $325.  28 U.S.C. § 1930(a)(6).  "Disbursements"

(continued...)

in a chapter 11 case as compared with a chapter 13 case, the legal fees would likely be many

multiples of what a chapter 13 debtor would have to pay.

Although there some reported cases supporting the debtors' position, the weight of

authority is decidedly to the contrary.  The cases most supportive of the debtors' argument are *In

re Mastroeni*, 56 B.R. 456 (Bankr. S.D. N.Y. 1985) and *In re Williams*, 155 B.R. 773 (Bankr. D.

Idaho 1993), both of which held that when a debtor is ineligible for chapter 13, and chapter 11 is

not a meaningful alternative, dismissal under § 707(b) is not consistent with the legislative intent

to encourage repayment under chapter 13.  Similarly, in *In re Wegner*, 91 B.R. 854 (Bankr. D.

Minn. 1988), the court refused to dismiss the debtors' case under § 707(b) because there was no

evidence of misconduct and because the debtors, who were ineligible for relief under any other

chapter, would be unable to repay their debts outside of bankruptcy.  Finally, *In re Bartlett*, 128

B.R. 775, 777 n.1 (Bankr. W.D. Mo. 1991), although determining certain debts to be

nondischargeable, also held in passing that dismissal for substantial abuse was not appropriate

when the debtor was not eligible for chapter 13 because she did not have a regular source of

income, since § 707(b) "was intended to be used where a debtor had the ability to make payments

to her creditors in a Chapter 13 case[.]"

The only reported decisions at the court of appeals level, while acknowledging that

ineligibility for chapter 13 relief is one factor to consider, reject the argument that it is

---

[12](...continued)
include all expenditures by a debtor, not merely those made to creditors under a plan.  The
debtors' current take-home income is $7,017.  If the entirety of that were disbursed each
month—either to pay necessary living expenses or to pay creditors under a plan—the U.S.
Trustee fee would be $650 per quarter based on $21,051 in quarterly disbursements.  *Id.*
Assuming four months to get to confirmation, and a 60-month plan, the minimum U.S. Trustee
fee would be 21 quarters times $650, or $13,650.

dispositive.  *In re Krohn,* 886 F.2d 123 (6th Cir. 1989) (affirming dismissal for substantial abuse

despite fact that debtor was ineligible for chapter 13 due to the amount of his unsecured debts

and holding "inability to qualify under chapter 13 should not be dispositive of whether there may

be a § 707(b) dismissal"); *Fonder v. U.S.*, 974 F.2d 996, 999 (8th Cir. 1992) ("[T]he essential

inquiry remains whether the debtor's ability to repay creditors with future income is sufficient to

make the Chapter 7 liquidating bankruptcy a substantial abuse of the Code.  We have never held

that, to be dismissed under § 707(b), a debtor must be eligible for Chapter 13 relief."); *In re

Stewart*, 175 F.3d 796, 810 (10th Cir. 1999) (upholding dismissal for abuse but stating that

ineligibility for chapter 13 is one factor to consider).

        In an unreported decision within this circuit, Judge Mannes explained that while he

agreed in principle with *Mastroeni*, "the fact that Debtors do not qualify for relief under chapter

13 is not dispositive of whether the dismissal under § 707(b) of the Bankruptcy Code is

appropriate."  *In re Wolk*, 2006 WL 4552817 at *3 (Bankr. D. Md. 2006).  The court, although

acknowledging the considerable difficulties the *pro se* debtors might face in obtaining

confirmation of a chapter 11 plan, nevertheless ruled that the case would be dismissed unless the

debtors converted to chapter 11.  *Id.* at *3-4.  *See, also, In re Nolan*, 140 B.R. 797, 702 (Bankr.

D. Colo. 1992) (dismissing case under § 707(b) despite fact that debtor did not qualify for

chapter 13 or chapter 11 protection); *In re Stratton*, 136 B.R. 804, 805-06 (Bankr. C.D. Ill. 1991)

(dismissing case under § 707(b) despite fact that debtors were ineligible for chapter 13 and

observing that result would otherwise be "discriminatory treatment of debtors with low debt

amounts versus those debtors who have high debt load"); *In re Lenartz*, 263 B.R. 331, 341

(Bankr. D. Idaho 2001) (dismissing case under § 707(b) even though debtors did not qualify for chapter 13 relief but allowing option to convert to chapter 11).

In short, although the debtors' argument is not without a certain surface appeal, the court agrees with the majority of courts that have held that ineligibility for chapter 13 relief is not dispositive of a motion to dismiss for abuse under § 707(b). The court does agree that it is a factor to consider, at least when chapter 11 is not a practical alternative. In this connection, the court notes that in both *Mastroeni* and *Williams*, the major reason those courts determined that chapter 11 was not a meaningful alternative was because the debtors had few assets and because an individual debtor's post-petition earnings were not property of the estate. Although that was true at the time those decisions were issued, BAPCPA has changed the landscape, and property of a chapter 11 estate now expressly includes "earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted[.]" § 1115(a)(2), Bankruptcy Code. In some instances, perhaps, the significantly higher administrative costs of chapter 11 might result in that chapter not being a practical alternative, and in such instances, the debtor's ineligibility for chapter 13 relief, although not dispositive, would be entitled to greater weight. But, as will be discussed, the court cannot find that the additional expense of a chapter 11 case would prevent these debtors from repaying a meaningful portion of their unsecured debts under bankruptcy court protection.

## B.

Turning then to the factors identified by the Fourth Circuit in *Green*, the court cannot find that the petition was filed because of sudden illness, calamity, disability, or unemployment. At the same time, this is not a case of debtors who ran up debt by consistently living beyond their

15

means.  Rather, it appears that they were the victims of a collapsing real estate market that caught

them by surprise as they were attempting to move from one house to another that was more

suited to their needs.  In retrospect, they clearly extended themselves unwisely, but certainly they

were not the only home buyers in the 2005 to 2007 time frame who did not foresee the

precipitous drop in property values that took even experienced real estate professionals in

Northern Virginia by surprise.  In any event, poor financial decisions, standing alone, do not

equate to abuse.  *In re Smith*, 354 B.R. 787 (Bankr. W.D. Va. 2006) (holding, in pre-BAPCPA

case, that chapter 7 filing was not a substantial abuse simply because debtors made unwise

financial decisions that increased their monthly living expenses).  The fall-off in real estate

values left the debtors with no ability to sell either property for the amount of the debt against it.

While they might have managed the mortgages against either property alone, they could not

manage both.  There is no evidence—and the U.S. Trustee does not contend—that the debtors

incurred cash advances and made consumer purchases far in excess of ability to pay, nor is there

evidence that the petition was filed in bad faith.  Certainly, the magnitude of the likely deficiency

claims if the debtors simply surrendered their property would have made repayment outside of

bankruptcy impossible.

     Similarly, notwithstanding the U.S. Trustee's suggestion that the debtors' schedules were

not completely accurate, the court cannot find that the schedules misrepresented the reality of the

debtors' financial affairs or that any inaccuracies resulted other than from honest mistakes.  It is

true, as the U.S. Trustee noted, that Schedule I ("Current Income of Individual Debtor(s)"), prior

to being amended, mistakenly reported as the wife's monthly income what was actually her semi-

monthly income; however, the correct amount was reported on the means test form.  Likewise,

16

the debtors, on their statement of financial affairs, mistakenly reported as 2008 "year to date" rental income an amount they had received in the last 12 months (in other words, a portion of the amount had been received in 2007 rather than 2008).  Again, the correct figures (rent received for the six month period preceding the filing of the petition) were used in computing CMI on the means test form.  The U.S. Trustee complains that a $22 semi-monthly deduction from Mrs. Crawley's paycheck is not reflected on her Schedule I, but the court would be hard-pressed to find such an error of that minor a magnitude as significant (particularly since its omission *increases* rather than decreases the debtors' reported take home income).  The U.S. Trustee further complains that the Statement of Financial Affairs, as originally filed, did not report the debtors' interest in three limited liability companies.  Mr. Crawley's testimony—which is unrebutted on the record and which the court finds credible—is that the companies had been created in anticipation of being used as vehicles for real estate investment, but that none of them had ever done any business, and that he had simply overlooked listing them.  Indeed, since the relevant question (Question 18) asks for information concerning "all *businesses* in which the debtor was an officer, director, partner, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self employed . . . within six years immediately preceding the commencement of the case," it is far from clear that the original answer was inaccurate, since by definition, a limited liability company that exists only on paper and has *never* conducted business can hardly be called a "business."  Put another way, mere dreams do not a business make.

The only serious discrepancy the court can find between the schedules and reality involves, again, the real estate.  On their Schedule J ("Current Expenditures of Individual Debtor(s)"), the debtors reported monthly living expenses of $14,334 per month.  This included

17

$9,173 in mortgage payments on the two residences as well as $241 in home maintenance

expenses.  The court agrees with the U.S. Trustee that the mortgage payments should not have

been included on Schedule J.  Unlike the means test form, which asks only whether secured debt

payments are contractually due, Schedule J calls for "the *average or projected* monthly expenses

of the debtor and the debtor's family *at time case filed*" (emphasis added).  The debtors, as noted,

had not made mortgage payments in more than two months at the time they filed their petition,

and had walked away from the two properties with no intention of returning or resuming

payments.  While they still had a *liability* on the mortgages, that liability would either be

discharged in chapter 7 or included in a bankruptcy repayment plan under chapter 11 or 13, and

in any event was not expected to represent an ongoing monthly living expense.  The same is true

with respect to the $241 shown on Schedule J for home maintenance expenses.  Accordingly, the

court agrees with the U.S. Trustee that the reported expenses on Schedule J, though accurate

reflections of what the debtors historically paid, include amounts that should not properly be

considered as "current expenditures."

　　This squarely raises the relationship of the debtors' future income to their future

necessary living expenses.  By giving up the two properties and moving into a less expensive

rental, the debtors have significantly reduced their living expenses.  Of course, in doing so, they

have lost the tax deductions associated with real estate ownership and have lost the income from

the rental.  Even so, the net result is a modest monthly surplus:[13]

---

[13]  The court has largely adopted the U.S. Trustee's adjustments as set forth on USTr. Ex. 9 and
11, except that the court's figures include the actual amounts of "other payroll deductions"
without backing out the voluntary deductions for company stock purchases and 401(k)
contributions as the U.S. Trustee has done.

**Income**

| | | |
|---|---|---:|
| Monthly gross wages | $ | 9,542 |
| Payroll taxes and social security | $ | 3,043 |
| Other payroll deductions | $ | 947 |
| Net monthly takehome pay | $ | 5,522 |
| Pension income | $ | 1,050 |
| Total monthly income | $ | 6,602 |

**Expenses**

| | | |
|---|---|---:|
| Rent | $ | 1,746 |
| Electric and heating fuel | $ | 180 |
| Telephone | $ | 100 |
| Other utilities | $ | 52 |
| Food | $ | 400 |
| Clothing | $ | 50 |
| Laundry and dry cleaning | $ | 35 |
| Transportation | $ | 370 |
| Charitable contributions | $ | 1,000 |
| Life insurance | $ | 63 |
| Auto insurance | $ | 152 |
| Taxes | $ | 208 |
| Auto installment payments | $ | 399 |
| Total monthly expenses | $ | 4,755 |

| | | |
|---|---|---:|
| Monthly income | $ | 6,602 |
| Monthly expenses | $ | 4,755 |
| Surplus | $ | 1,847 |

Over five years, the surplus would amount to $110,804. And as the U.S. Trustee notes, the surplus could be increased by an additional $24,926 by the simple expedient of foregoing the stock purchase contributions and voluntary 401(k) contributions the debtors currently make. USTr Ex. 14. Of course, simply because a retirement contribution is voluntary does not mean that it is improper, particularly when an employer does not offer a traditional defined-benefit pension plan. Put another way, it is prudent (particularly given the debtors' ages) to make adequate provision for retirement, and the deduction for the 401(k) contribution is certainly modest ($21.97 per paycheck). But even putting aside the 401(k) contribution, it fairly appears that the debtors would have at least $110,000, and arguably more, that could be used to pay the administrative expenses of a chapter 11 case and fund a five-year chapter 11 plan. Unsecured

19

claims (including the undersecured portion of secured claims) total $345,571.  Even assuming

chapter 11 professional fees of $20,000 and U.S. Trustee fees of $13,650, at least $76,350 would

be available for unsecured creditors, which would allow a dividend of approximately 22 cents on

the dollar.  Although relatively modest, such a payout can hardly be termed insignificant and is

sufficiently meaningful that the debtors would have a reasonable chance of securing creditor

acceptance.

       Balancing all the factors, the court—while it cannot find that the petition was filed in bad

faith or that the debtors have been reckless or dishonest in managing their financial

affairs—believes that responsibility to their creditors requires some effort by the debtors to repay

their creditors to the extent they reasonably can.  Given the magnitude of the likely deficiencies

on foreclosure of the mortgages against the two properties, repayment in full is not a realistic

option, but there is a meaningful payment that is within the debtors' ability to make, even

without any additional belt-tightening now that they have substantially reduced their housing

expense.  While mere ability to fund a partial-repayment plan would not have been sufficient,

standing alone, to support dismissal under the former standard of "substantial abuse," *see In re

Cemal*, 396 B.R. 649 (Bankr. E.D. Va. 2004), under the present standard it is undoubtedly the

primary factor and will usually be controlling in the absence of other considerations.  In this case,

the other factors do not outweigh the showing by the U.S. Trustee that the debtors have the

ability to repay a meaningful portion of their debts in a bankruptcy repayment plan and that

allowing them to simply discharge that debt in chapter 7 would constitute an abuse.

A separate order will be issued consistent with this opinion dismissing the debtors' case but staying the effectiveness of the order for 10 days to give the debtors an opportunity to convert to chapter 11 if they are so advised.

Date: _____            _____

                                                Stephen S. Mitchell

Alexandria, Virginia                            United States Bankruptcy Judge

Copies to:

Sylvester Crawley
Kathryn Rogers Crawley
280 Yoakum Parkway, #1410
Alexandria, VA 22304
Debtors

Gregory H. Counts, Esquire
Tyler, Bartl, Ramsdell & Counts, P.L.C.
700 S. Washington St., Suite 216
Alexandria, VA 22314
Counsel for the debtors

Frank Bove, Esquire
Office of the United States Trustee
115 South Union Street, Suite 210
Alexandria, VA  22314

Gordon P. Peyton, Esquire
Redmon, Peyton & Braswell
510 King Street, Suite 301
Alexandria, VA  22314
Chapter 7 trustee

**Comparison of Means Test Calculations**

|  | Debtors | U.S.Tr. | Court |
|---|---|---|---|
| Wages | $ 9,542 | $ 9,542 | $ 9,542 |
| Pension | $ 1,050 | $ 1,050 | $ 1,050 |
| CMI | $ 10,592 | $ 10,592 | $ 10,592 |
|  |  |  |  |
| Annualized CMI | $ 127,106 | $ 127,106 | $ 127,106 |
| Median (Virginia: 2 persons) | $ 61,115 | $ 61,115 | $ 61,115 |
|  |  |  |  |
| Deductions |  |  |  |
| National: food | $ 961 | $ 961 | $ 961 |
| National: health care | $ 114 | $ 114 | $ 114 |
| Local: housing (non-mort) | $ 416 | $ 500 | $ 500 |
| Local: housing(mort/rent) | $ - | $ 1,813 | $ 1,813 |
| Local: transp. (operation) | $ 460 | $ 660 | $ 660 |
| Local: transp. (ownership veh #1) | $ 90 | $ 90 | $ 90 |
| Local: transp. (ownership veh #2) | $ 489 |  | $ 489 |
| Other: taxes | $ 745 | $ 3,043 | $ 3,043 |
| Other: employment | $ 168 | $ 168 | $ 168 |
| Other: telecommunications | $ 100 | $ 100 | $ 100 |
| Additional: Health ins | $ 180 | $ 360 | $ 180 |
| Additional: Food and clothing | $ 34 | $ 34 | $ 34 |
| Additional: Charitable contrib. |  | $ 1,000 |  |
| Debt payment: Gangplank | $ 1,356 | $ - | $ 1,356 |
| Debt payment: Gangplank | $ 2,866 | $ - | $ 2,866 |
| Debt payment: Maxfield | $ 1,407 | $ - | $ 1,407 |
| Debt payment: Maxfield | $ 3,544 | $ - | $ 3,544 |
| Debt payment: auto | $ 399 | $ 399 | $ 399 |
| Chap 13 admin expense | $ - | $ 235 |  |
| Total Deductions | $ 13,328 | $ 9,477 | $ 17,724 |

Reconciliation

|  | Debtors | U.S.Tr. | Court |
|---|---|---|---|
| CMI | $ 10,592 | $ 10,592 | $ 10,592 |
| Less deductions | $ 13,328 | $ 9,477 | $ 17,724 |
| Disposable income | $ (2,736) | $ 1,115 | $ (7,132) |